Filed 3/24/23 In re D.C. CA4/2
*See dissenting opinion*

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re D.C., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>D.C.,<br><br>Defendant and Appellant. | E078193<br><br>(Super.Ct.No. J279005)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County. Bryan K. Stodghill, Judge. Affirmed.

Jennifer A. Gambale, under appointment by the Court of Appeal, for Defendant and Appellant.

1

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski, Donald W. Ostertag and Juliet W. Park, Deputy Attorneys General, for Plaintiff and Respondent.

On June 10, 2019, when defendant and appellant D.C. was 16 years old, and already on probation, he had a confrontation with the victim inside a Stater Bros. grocery store in Baseline. Defendant pulled a handgun from his fanny pack and pointed it at the victim. The victim walked out of the store and defendant put away the handgun. The victim then ran back into the store and tackled defendant. Defendant's friend, Justin Bell, was able to pull the victim off defendant. Defendant pulled the handgun out of his fanny pack and shot the victim. The victim fell to the ground and defendant kept shooting him until defendant finally fled the store. The victim died at the scene.

A juvenile wardship petition was filed against defendant pursuant to Welfare and Institutions Code section 602, subdivision (a), charging defendant with murder, several weapons-use allegations and a gang allegation. After a contested jurisdictional hearing, the juvenile court found defendant guilty of the lesser included crime of voluntary manslaughter; the weapons-use allegations were dismissed; and the gang allegation was found not true.

On appeal, defendant contends insufficient evidence supported the juvenile court's finding that he committed voluntary manslaughter because the People failed to prove he was not acting in self-defense when he fired the fatal shots.

2

## FACTUAL AND PROCEDURAL HISTORY

### A.   PROCEDURAL HISTORY

On February 6, 2019, defendant was placed on probation and was released to his mother's custody after an incident involving an assault on a peace officer and possession of a firearm. On July 5, 2019, the San Bernardino County District Attorney's Office filed a subsequent juvenile wardship petition pursuant to Welfare and Institutions Code section 602, subdivision (a), charging defendant with a violation of Penal Code section 187, subdivision (a). In addition, he was charged with personally and intentionally discharging a firearm causing great bodily injury or death within the meaning of Penal Code section 12022.53, subdivisions (d); personally and intentionally discharging a firearm within the meaning of Penal Code section 12022.53, subdivisions (b) and (c): and that the crime was committed on behalf of and at the direction of a criminal street gang within the meaning of Penal Code section 186.22, subdivision (b)(1)(C).

A jurisdictional hearing commenced on October 29, 2021. After the hearing, on November 23, 2021, the juvenile court found defendant guilty of the lesser included offense of voluntary manslaughter within the meaning of Penal Code section 192, subdivision (a). The juvenile court found the gang allegation pursuant to section 186.22, subdivision (b)(1)(C) not true and dismissed all the weapons-use allegations under section 12022.53 finding they did not apply to voluntary manslaughter. On December 9, 2021, defendant was continued as a ward of the court. He was given a total sentence of seven years four months to be served in a youth treatment facility, with credit for 950 days already served in custody.

## B.    FACTUAL HISTORY

### 1.    *EYEWITNESS TESTIMONY*[1]

On June 10, 2019, at 4:13 p.m., defendant entered the Stater Bros. grocery store in Baseline (store) with another male identified as Justin Bell and a female who was identified as Alisha Turner.  When they entered the store, Joseph Ramirez, an employee, was restocking sodas in the front of the store.  He observed a man in a red shirt, later identified as the victim, walk by a man with a fanny pack, who was identified as defendant.  Joseph[2] saw defendant pull a gun out of the fanny pack and saw the victim leave the store.  As Joseph was restocking, he heard fighting behind him.  He then heard five gunshots; he ran and hid in the janitor's closet.

In his statement to police, Joseph stated that he saw "three guys" together in the store; one of them had a fanny pack.  Another man in a red shirt walked past them.  The man pulled a gun out of his fanny pack and pointed it at the man in the red shirt; the man in the red shirt left the store.  The three men ran toward the front door.  The man in the red shirt "starts coming at the guy with the fanny pack."  They started fighting.  The man with the fanny pack pulled out the gun and then Joseph heard two shots.  Joseph ran to the janitor's closet and hid.  He heard several more gunshots.

---

[1] Several witnesses were presented to support the gang allegation.  Since the trial court found the gang allegation not true, we will not provide the facts from these witnesses.

[2] We refer to some witnesses by their first names for clarity due to shared last names (Cal. Rules of Court, rule 8.90(b)).  No disrespect is intended.

Maritza Mendez was in the store at approximately 4:30 p.m. on June 10, 2019. She had seen the victim while she was waiting in line at the store. He was paying for groceries in another line. The victim approached defendant, who was standing farther back in the same checkout line. Mendez heard defendant tell the victim to step away from him or he was going to shoot him. Defendant pointed a gun at the victim. When defendant pointed the gun at the victim, the victim backed up and walked away. Defendant was cussing at the victim.

Mendez observed the victim start to leave the store but came back when defendant said something to him. Defendant jumped out of the line. Defendant told the victim that they should handle their problems outside and the victim said he was not leaving the store. Defendant then shot the victim. Mendez heard three gunshots. She ran to the back of the store. Mendez did not see a physical altercation between the victim and defendant prior to the shooting. Mendez did not see any weapons in the victim's hands before he was shot by defendant.

Virginia Pedersen was also shopping at the Stater Bros. store around 4:00 p.m. on June 10, 2019. While shopping, she observed defendant and the victim arguing. They were fighting while the victim was in the process of paying for his groceries. Defendant asked the victim to go outside the store but he refused. Defendant pulled out a gun. Pedersen did not see shots fired as she hid behind the cashier. She heard five gunshots in rapid succession. She did not see anything in the victim's hand prior to him being shot. She identified defendant as the shooter.

5

Kevin Davis was working at one of the checkstands at around 4:20 p.m. on June 10. He heard "yelling and scuffling." He then heard a woman yell that someone had a gun. He saw defendant pull a gun out of his fanny pack. At some point, defendant and the victim were fist-fighting. The victim appeared to be leaving the store, but ran back in the store and he and defendant were again fist-fighting. It was then that defendant pulled the gun out of his fanny pack. Davis ran to the janitor's closet and did not see the shots that were fired. He heard between four and six gunshots. There were two initial gunshots and then a few single shots. The victim did not appear to have a weapon.

Teresa Ramirez, an employee at the store, was on her lunch break at 4:20 p.m. She was in the break room. As she was headed back into the store after her lunch, she observed the victim and defendant fighting in the store. She did not see how the fight started. As they were fighting, defendant pulled out a gun and shot the victim. Ramirez recalled one gunshot and the victim kept fighting. She then heard more shots fired and the victim fell to the floor. She heard a total of four gunshots. She recalled that all of the shots fired by defendant were while the victim was still standing. She told law enforcement on the night of the incident that defendant also shot at the victim while he was on the floor. She insisted she did not intend to the tell the officers that defendant shot at the victim while he was on the ground. The victim did not have a weapon.

A portion of Teresa's statement made to the police was played. She stated, "There was one when he was about to fall on the floor, and then there was three more once he was already on the floor."

6

B.    INVESTIGATION

San Bernardino Police Detective Flesher responded to the shooting at around 5:00 p.m.. Bullet fragments were found near the victim's body. There were three bullet strikes to the tile floor and to the railings near the cash register lanes in the store. A bullet ricocheted off the ceiling. A metal object shaped like a cat's head was found near the victim. It could possibly be used as a weapon.

San Bernardino Police Sergeant Plummer responded to the shooting. He showed Joseph a photographic lineup on June 12, 2019. Joseph identified defendant's photograph as the person who was the shooter. Defendant was arrested on July 2, 2019, at a motel in San Bernardino.

Gregory Romano worked at the Stater Bros. as the supervisor of investigations. He was in charge of maintaining the surveillance video at the store. Romano stated there were surveillance cameras both inside and outside the store. They all showed different angles of the shooting. He provided the video surveillance taken at the time of the shooting to law enforcement. Romano described the videos. One angle of the video showed defendant, Bell and Turner entering the store at 4:13 p.m. and grabbing a shopping cart. They went toward the first aisle in the store. The victim and his friend were also in the store and passed by defendant's group. The groups went to opposite areas of the store.

The confrontation and shooting began at 4:23 p.m. Defendant appeared to be walking toward the exit of the store and the victim could be seen running toward him. The victim did not appear to have anything in his hands. Defendant put his hand over his

7

fanny pack. The video showed Bell "in a physical hold" with the victim while defendant had a gun in his hand. The video then showed Bell running towards the exit door, and the victim "down to his knee and in a physical hold with" defendant. Customers in the lines at the store appeared to be ducking down behind the registers and running away from the register area.. The next image from the video surveillance showed the victim down on the ground and defendant standing over him. The next image was the victim on the ground and defendant standing over him holding a gun in his hand.

Detective Flesher stated that the video surveillance did not show the bullets striking the floor or any other objects. You could see the location where the confrontation occurred and approximately when the shooting occurred. Defendant was seen fleeing the scene and still shooting, approximately one or two times, toward the victim, who was lying on the ground. On the video, "you can see the suspect reaching into the fanny pack, removing a revolver, and engaging with the victim again. The victim falls to the ground. The suspect then starts retreating away from the victim as he is pointing the gun and firing at him on the ground." No revolver was found that was suspected to be the murder weapon.

The videos were shown to the juvenile court.[3] In pertinent part, the video showed defendant standing at the entrance of the store. The victim rushed back into the store and ran directly at defendant. They struggled. Bell grabbed the victim while defendant turned his back and pulled his gun out of his fanny pack. Defendant pointed the gun at

---

[3] Defendant has provided these videos to this court without objection from the People.

8

the victim and Bell ran. Defendant was about one foot from the victim at this point. The victim then fell toward defendant and the victim went to the ground. Although obscured somewhat from view, defendant can be seen close to the victim as the victim is on the ground. Defendant appears to be standing over the victim pointing the gun directly at him. Defendant then ran from the store, shooting back at the victim, who lay on the floor.

The prosecution submitted still photographs from the video surveillance. Defendant could be seen with the shopping cart and wearing a white fanny pack. The victim and defendant appeared to be staring at each other. The victim walked out of the store. The victim returned to the store and grabbed defendant. Bell held onto the victim while defendant had his back to them but was within a few feet. In the next image, defendant was facing both of them. The next images showed defendant and the victim holding onto each other and then the victim falling to the ground. A gun cannot be seen but everyone in the store was either running or ducking down. Bell was running out the door. The next image showed defendant standing directly over the victim who was on the ground. Defendant's hand was stretched toward the victim. The victim appears to be on his side while defendant shoots down at him with his arm outstretched looking to nearly touch the victim. Defendant was then seen running away and still facing back at the victim with his hand outstretched with the gun in his hand.

Dr. Changrsi performed an autopsy on the victim. Both bones in the victim's upper arms were broken; this was caused by gunshots. There were projectile fragments in the right side of the victim's chest, both upper arms, and left upper back. The victim had five gunshot wounds. There were entry gunshot wounds on his left upper chest, left

9

side of his abdomen, front of both upper arms, and the back of his left thigh. There was soot around the gunshot wound to the left upper chest. This meant that the gun was within one-half inch of the victim when it was fired. The bullet traveled through his body and exited the right side of his back injuring his left lung, pulmonary artery, heart, aorta, right lung, and liver. There was internal bleeding associated with this gunshot in both the lungs and heart.

The wound to the abdomen also had soot around it revealing that the gun was within one-half inch of the victim when it was fired. This bullet exited through the left side of the back injuring the victim's spleen and kidney. There was internal bleeding from this gunshot wound. The one shot to the upper arm entered the front upper arm, broke the bone, and then exited the inner upper arm. There was no soot or stippling on this wound. The gun was fired from at least two feet away from the victim to cause this injury. The gunshot wound to the left upper arm had stippling but not soot. This showed that the gun was fired from between one and two feet away. This bullet broke the upper left arm and moved into the upper back. The projectile was recovered. There was no soot or stippling on the gunshot to the left thigh. The gun was fired at least two feet from the victim. The bullet exited the front of the thigh. The victim had other superficial injuries that may have been caused by bullets hitting something else and then hitting the victim.

The cause of death was multiple gunshot wounds. The victim would have died in minutes. The gunshots to the chest and abdomen would be fatal. The gunshot wounds to the upper arms and left thigh were not fatal. Dr. Changrsi could not determine which

10

gunshots wounds happened first and which ones happened last. He only knew that the wound to the chest occurred before the wound to the abdomen. Based on toxicology reports, the victim tested positive for marijuana and methamphetamine. There was no way of knowing based on the levels how it would have affected him. Autopsy photos showed the location of the gunshots. The gunshot to the victim's abdomen was on the side of the abdomen closer to the victim's back.

Defendant presented no evidence on his behalf.

## DISCUSSION

Defendant contends the juvenile court erred by finding him guilty of voluntary manslaughter. He claims the juvenile court erred by concluding that when defendant fired the initial shots, he was entitled to defend himself from the victim, but by continuing to fire, he used more force than was reasonably necessary. Defendant insists the fatal shots were the first two shots fired at the victim. Accordingly, when defendant killed the victim, he was acting in self-defense. It was "irrelevant" that defendant continued to shoot at the victim while the victim was on the ground. Defendant's claim is based on the conclusion that the first two shots fired by him were the fatal shots. While the evidence could support such a claim, it is not the only interpretation of the evidence. As such, the juvenile court properly concluded that defendant used unreasonable force and was guilty of voluntary manslaughter.

## A.    ADDITIONAL FACTUAL HISTORY

At the end of the trial, the juvenile court found, "The Court finds in this case that at the time that the minor fired a weapon that he was entitled to use self-defense. He was entitled to defend himself from the attack by the identified victim in his case.

"There is, at least in this Court's mind, and after reviewing the video, there is no indication that the minor intended, prior to shooting, to kill or further assault the identified victim in this case.

"The evidence is that the identified victim approached the minor in the grocery store. The evidence is that as soon as the . . . victim approached the minor, based on the crowd reaction there was a confrontation. There was no explanation for the victim approaching the minor. But the evidence suggests that when he made contact with the minor that the contact was either hostile or confrontational.

"The minor responded by pulling a gun and pointing at the victim and told him to [g]et away from me or I will shoot you. The Court finds that that is a defensive statement and not offensive. There was also evidence from witness statements that there was some discussion as to the parties agreeing to meet outside.

"The victim then immediately left the location where he made contact with the minor. He then walked outside of the store. Before he walked outside, he looked right at the minor's companion. It was clear that the minor and his companion were going to—at least heading towards the exit to the store.

"As the minor got near the exit, he stopped and he turned to looked [*sic*] into the interior of the store. At the time that he turned to look, the gun was in his fanny pack.

12

He didn't have the gun in his hand. So the minor's actual intent is not clear to this Court. What he intended or what he planned to do is not clear.

"However, the victim began to approach the minor in a very quick manner while the minor's back was turned.

"As he got closer to the minor, the minor turned around, and it was only when he saw the victim approaching him that he reached for his fanny pack.

"So the Court can conclude from that that the minor reached for his fanny pack to defend himself. After he was attacked by the victim, he was able to pull the gun out, and he fired the gun. At the time that he fired the gun, the Court does believe that he had a right to defend himself.

"There is—the evidence is, I should say, that the victim was confrontational and was hostile towards the minor. And he was of unknown—of an unknown capacity and unknown capability, although we have concluded here from reviewing the video and after the victim was searched that he didn't have a firearm. But it's not clear to this Court where or not he had any other weapon. It's possible that he had another weapon.

"And—but what is more important is that in the brief interim of time that the minor interacted with the victim, he could not have known when the victim came back into that store whether or not he was armed or not. He could not have known whether or not he possessed a firearm, whether he possessed a shank or something else. So the Court believes his initial reaction to being attacked by the victim, of the shooting [of] the shooting the victim, was justified.

13

"However, under the law for self-defense, the minor could use no more force than reasonably necessary to defend himself. And the evidence is that he shot the victim five times. And that there were additional shots that were fired while the victim was on the ground. To that extent, the self-defense is not available to the minor as he used more force than was necessary. It's the Court's belief that at the time that he formed the opinion to kill the victim. And, therefore, the self-defense claim does not apply to him.

"The Court does, however, find that being attacked in the manner that the minor was attacked provided adequate provocation. And that his response to the assault and then his shooting of the victim was in the heat of passion. And that his killing of the victim was during the heat of passion in the middle of a quarrel. So the Court believes that based on the fact that he was—or that the allegation that this is a voluntary manslaughter is true."

B.     <u>SUFFICIENCY OF THE EVIDENCE</u>

Defendant essentially claims the evidence does not support that he used more force than necessary to defend himself. The fatal shots were the first two shots and the remaining gunshots were "irrelevant."

To review claims of insufficient evidence, " '[w]e presume in support of the of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence.' " (*People v. Westerfield* (2019) 6 Cal.5th 632, 713.) " 'The same standard governs review of the sufficiency of evidence in adult criminal cases and juvenile cases: we review the whole record in the light most favorable to the judgment to decide whether substantial evidence supports the conviction, so that a reasonable fact finder could find

14

guilt beyond a reasonable doubt.' " (*In re A.G.* (2020) 58 Cal.App.5th 647, 653; see also *In re James B.* (2003) 109 Cal.App.4th 862, 872.) Substantial evidence is that which is "reasonable, credible, and of solid value." (*Westerfield*, at p. 713.)

"Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal." (*People v. Zamudio* (2008) 43 Cal.4th 327, 358; see also, *People v. Kraft* (2000) 23 Cal.4th 978, 1053-1054.)

"Even if different inferences can reasonably be drawn from the evidence, we cannot substitute our own inferences or deductions for those of the trial court. We must consider all of the evidence in the light most favorable to the prevailing party, giving that party the benefit of every reasonable inference from the evidence tending to establish the correctness of the trial court's decision, and resolving conflicts in support of the trial court's decision. (*In re Ryan N.* (2001) 92 Cal.App.4th 1359, 1373.) " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*People v. Bean* (1988) 46 Cal.3d 919, 933.) "[T]he relevant inquiry on appeal remains whether any reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." (*Ryan N.*, at p. 1372.)

" 'Self-defense, when based on a reasonable belief that killing is necessary to avert an imminent threat of death or great bodily injury, is a complete justification, and such a killing is not a crime.' " (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 648.) "[A] defendant acts in lawful self-defense if 'one, the defendant reasonably believed that he

15

was in imminent danger of suffering bodily injury . . . or was in imminent danger of being touched unlawfully; two, the defendant reasonably believed that the immediate use of force was necessary to defend against that danger; and three, the defendant used no more force than was reasonably necessary to defend himself against that danger.' " (*People v. Clark* (2011) 201 Cal.App.4th 235, 250.)

" 'The principles of self-defense are founded in the doctrine of necessity. This foundation gives rise to two closely related rules. . . . First, only that force which is necessary to repel an attack may be used in self-defense; force which exceeds the necessity is not justified. [Citation.] Second, deadly force or force likely to cause great bodily injury may be used only to repel an attack that is in itself deadly or likely to cause great bodily injury. . . . Under these two principles a person may be found guilty of unlawful homicide even where the evidence establishes the right of self-defense if the jury finds that the nature of the attack did not justify the resort to deadly force or that the force used exceeded that which was reasonably necessary to repel the attack.' " (*People v. Hardin* (2000) 85 Cal.App.4th 625, 629-630.)

Substantial evidence supports the juvenile court's finding that defendant used more force than reasonably necessary to defend himself. The question in this case turns on whether the juvenile court could reasonably conclude that the fatal shot occurred after defendant no longer had the justification to defendant himself. We must determine if the trial court reasonably could conclude that fatal shot was inflicted when the victim was on the ground.

16

This court has reviewed the still photographs from the video, the video itself, and the witness testimony, and find the evidence supports the juvenile court's finding that the fatal shot could have been fired against the victim while he was on the ground. The video from the side angle is the most helpful in this case. The victim is seen rushing back into the store and going directly for defendant. Defendant has his gun in his fanny pack when the victim approached him. The victim was held back from defendant by Bell while defendant pulled his gun out of his fanny pack.[4] From some distance it appears that defendant shot at the victim, who appeared to go toward defendant, and fell toward defendant. Defendant had the gun pointed at the victim the entire time. It is not possible to determine when defendant actually shot the gun from the video. The victim fell to the ground and defendant leaned directly over the victim still with the gun pointed directly at the victim. The still photograph appears to show that the victim at this point was on his side. The autopsy photograph shows that the abdomen shot entered on the victim's side. The evidence supports that defendant shot the victim at very close range while the victim was on the floor and reasonably could have been the fatal shot to the abdomen.

---

[4] We question whether the juvenile court should have concluded that defendant acted in self-defense in this case. The video makes clear that while the victim first rushed at defendant, Bell was able to grab the victim and hold him back by both arms. The juvenile court did not address that Bell was able to stop the victim. Defendant had his back to the victim and pulled the gun out of his fanny pack. He was in no immediate danger. While the victim was still being held by Bell, defendant turned and pointed the gun at the victim. Although the video is not conclusive, it appears that at this point defendant shot the victim. Bell ran away. Defendant could have fled the scene once Bell was able to hold back the victim. He also could have used lesser means to defend himself than shooting the victim, as both he and Bell could have subdued the victim.

17

The juvenile court did not conclude in its ruling that the fatal shots were the first two shots while defendant and the victim were still struggling.[5]  Rather, the juvenile court found that the force used was unreasonable because there were five shots fired, some of which were while the victim was on the ground.  The still photographs from the video do not conclusively show that the fatal shots were the first two shots fired by defendant.  In fact, the photograph of the victim on the ground shows defendant's arm outstretched very close to the victim's body.  The video also shows the victim falling on the ground and defendant still very close to the victim.  The defendant equally supports that the defendant shot the fatal shot while the victim was struggling with him and falling, as it does that the defendant fired the fatal shot while the victim was on the ground.  The coroner could not conclusively state that the fatal shot was the one to the chest or to the abdomen.  While the video and still photographs appear to show that defendant shot the victim in the chest while they were struggling, it also shows that defendant could have shot defendant in the abdomen after he fell to the ground.  Again, the autopsy photographs show that the abdomen gunshot was to the victim's side, and the coroner could not definitely state whether the fatal shot was to the chest or the abdomen.  In the still photograph, defendant was leaning over the victim while he was on the ground and

_____

[5] The prosecutor argued in support of first degree murder in his closing that the first two shots were fatal and defendant kept shooting showing he clearly intended to kill the victim.  The juvenile court rejected that defendant committed first degree murder and did not state in its ruling that the fatal shots were the first two shots fired.  The trial court independently viewed the evidence, including the video, and could reasonably determine that the evidence did not conclusively support the prosecutor's argument that defendant committed first degree murder.  The prosecutor was not required to argue an alternative theory.

the victim appears to be on his side. It was reasonable for the juvenile court to conclude that defendant shot the victim in the abdomen while he was on the ground.

None of the witnesses described where the victim was shot. The evidence does not establish the timing of the fatal gunshots, and the juvenile court could reasonably conclude that shooting five times, especially after the victim fell to the ground, was force that exceeded defendant's necessity to defend himself. Even if this court were to review the evidence and believe it also supports that the two fatal shots occurred while the victim was still standing, "we cannot substitute our own inferences or deductions for those of the trial court." (*In re Ryan N.*, *supra*, 92 Cal.App.4th at p. 1373.)

Defendant contends this case is unlike *People v. McCurdy* (1934) 140 Cal.App. 499. In *McCurdy*, defendant was at a bar and got into an argument with the victim. The victim rushed at the defendant with a pool cue, and defendant shot him one time causing the victim to fall to the floor. The defendant then shot the victim several more times. An autopsy showed that the victim had been shot seven times and that some of the fatal shots were fired while the victim was on the ground. (*Id.* at pp. 501-503.) The defendant claimed he shot the victim in self-defense. The jury rejected the self-defense claim. The appellate court upheld the finding, holding that while "defendant may have fired the first shot in self-defense, disabling his assailant, he was not justified in continuing firing or in fatally wounding the assailed, particularly while the deceased lay upon the floor. [Citations.] The testimony of the doctor was to the effect that two of the shots fired while the deceased lay upon the floor would of themselves have caused death. It was within the province of the jury to determine whether the defendant acted in self-defense and whether

19

the means used were justified. Having resolved these issues against defendant upon conflicting evidence the verdict of the jury is conclusive." (*Id.* at pp. 503-504.)

Here, the evidence established that the victim had been shot five times, two of which were fatal. The evidence, however, did not establish when the fatal shots were fired. The juvenile court could reasonably conclude that the fatal shot was fired after defendant was acting in self-defense. The evidence supports that defendant committed voluntary manslaughter.

**DISPOSITION**

The judgment is affirmed in full.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

<u>MILLER</u>                        
                                                                     J.

I concur:

<u>RAMIREZ</u>                      
                        P. J.

[E078193, *In re D.C.*]

RAPHAEL, J., dissenting.

Sixteen-year-old D.C. shot his attacker at point-blank range in the heart. The entry wound showed the gun fired no more than a half-inch from the attacker's chest.

As the coroner described the shot in his testimony: "the bullet perforates the left upper chest. It injured the left lung, the pulmonary artery, the heart, the aorta, the right lung, the liver, and the bullet exited the right side of the back."

The shot instantly dropped the attacker to the ground, with his legs in the air. It was a "fatal wound . . . [b]ecause of the injuries to both lungs, the heart, and the liver." As the coroner further testified about the shot's immediate effect: "with this massive injury . . . the heart is no longer, or slowly becoming, dysfunctioning and it was going to stop and the decedent was going to die."

The dispute at trial was about whether D.C. fired in self-defense. The trial court found that shot was in self-defense. "[A]t the time that the minor fired a weapon [] he was entitled to use self-defense. He was entitled to defend himself from the attack by the identified victim in this case."

Had D.C. stopped shooting when the attacker dropped, the trial court's self-defense finding meant that he could not be convicted of a crime, despite killing the man.

But D.C. shot the victim four more times, over less than five seconds, as he fled from the store. The trial court found that the shots while the victim was on the ground were not covered by the defense: "there were additional shots that were fired while the victim was on the ground. To that extent . . . self-defense is not available to the minor as

1

he used more force than was necessary." For those shots, the court found D.C. guilty of voluntary manslaughter: "being attacked in the manner that the minor was attacked provided adequate provocation," so he shot the supine victim "during the heat of passion."

With self-defense an all-or-nothing trial issue, a verdict of voluntary manslaughter could have been supported on either of two theories that encompassed *all* D.C.'s shots. First, the trial court could have rejected self-defense but found that the attacker's provocation caused *all* D.C.'s shots to have been made in the heat of passion. Second, the trial court could have found imperfect self-defense, meaning D.C. had an actual but unreasonable belief of a need to defend himself. (See, e.g., *People v. Rangel* (2016) 62 Cal.4th 1192, 1226). But the trial court did not apply these theories, as it found that the initial shot was in self-defense.

The question that D.C. raises on appeal is whether, where the attacker would have died from the shot fired in self-defense, the *later shots alone* can legally support the *manslaughter* conviction.

In explaining its verdict, the trial court did not address whether the later shots *caused* the death. An act may constitute manslaughter only by causing the death of a human. (*People v. Blakely* (2000) 23 Cal.4th 82, 86; *People v. Bernhardt* (1963) 222 Cal.App.2d 567, 591 [state "must establish the 'causal connection' between the violation and the loss of life"].) Homicide crimes require proximate causation, meaning that "the death would not have happened without the act." (*People v. Carrillo* (2008) 163

Cal.App.4th 1028, 1038; *People v. Bland* (2002) 28 Cal.4th 313, 335; CALCRIM No. 572.)

Could the shots on the prone victim — already dropped by a shot in the heart — have proximately caused his death?

Three shots hit the man's upper arms and thigh. Those shots obviously cannot support a manslaughter conviction, as they were not fatal. Shooting the felled man was criminal, perhaps assault with a deadly weapon, but not manslaughter.

The majority opinion upholds the trial court's verdict by finding that the shot that entered the man's abdomen supported manslaughter. That shot could have been fatal. But that shot was not the direct (or sole) cause of the death. The death would have happened anyway from the point-blank shot to the heart. That shot was in self-defense.

Under a concurrent causation theory, a second fatal shot can proximately cause a death even if a victim would have died from a fatal first shot. If the second shot was a "substantial factor" in causing the death, a homicide conviction is supported. (*People v. Skiff* (2021) 59 Cal.App.5th 571, 581; see CALCRIM No. 572.) The shot cannot be a "trivial or remote factor." (*Ibid.*)

Here, that theory lacks evidence. The point-blank shot to the heart was so lethal that the coroner explained that the abdomen shot engendered "less blood in the abdomen than expected" because the heart had already stopped or slowed pumping. The coroner testified that the attacker "died within minutes" at the scene, and we do not know how he would have testified if asked whether the abdomen shot hastened the death from the fatal heart shot—even by a bit. As the shot made in self-defense floored the victim and

3

stopped his heart, the further shot may have been a trivial factor in causing the death. There is no evidence that it was a substantial factor. A concurrent causation theory simply wasn't addressed at trial.

The gratuitous shots while fleeing deserve punishment, so it is tempting to rescue the manslaughter verdict. To do so, the majority opinion resorts to a factual theory not identified by the trial court and not developed by the People at trial. It lacks substantial evidence. I respectfully dissent, as I would reverse this conviction.

RAPHAEL _____
J.